## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | * | No. |
| | * | |
| Cellular Telephone #1 | * | <u>Under Seal</u> |
| LG Model number LGMS210 | * | |
| Bearing IMEI: 359998-08-132851-2 | * | |
| | * | |
| Cellular Telephone #2 | * | |
| Samsung Model number SM-B311V | * | |
| Bearing HEX MEID: A00000477CA231 | * | |
| | * | |
| Cellular Telephone #3 | * | |
| LG Model number LGMS428 | * | |
| Bearing IMEI: 358479-07-378228-0 | * | |

### <u>AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT</u>

I, Kevin Smith, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, deposes and states as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a Special Agent with the ATF since August 2015. Prior to this, I was employed as a Criminal Investigator with the United States Marshals Service from April 2008 until August 2015. In my work with the ATF, I have received training and experience in investigating the illegal possession and trafficking of firearms, and controlled substances, as a violation of state and/or federal law. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of firearms and narcotics, the laundering of illegally obtained proceeds, and the organization of drug conspiracies. In the course of

conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations, including undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting and supervising court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

3.      Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms which traffickers use to disguise conversations about their narcotics activities.  From my training and experience, I have learned, among other things, that narcotics traffickers use cellular telephones to further their illegal activities and in many cases drug dealers will frequently "dump" or discard their phones and/or phone numbers in the belief that, by so doing, they can avoid detection and thwart the efforts of law enforcement.  Cellular telephones also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities.  Additionally, narcotics traffickers usually do not expressly refer to heroin, phencyclidine (PCP), cocaine, cocaine base, or other controlled substances by name, and, when they do so, it is most often a mistake.  Instead, they routinely refer to drugs and drug quantities – and also quantities of cash – by using seemingly innocuous words or phrases in an effort to conceal the true nature of their illegal activities and thwart detection by law enforcement.  Narcotics traffickers also frequently have access to several

cellular telephones and they periodically use newly acquired cellular telephones, or frequently change cellular telephones, to avoid detection and attempt to thwart apprehension by law enforcement. These cellular telephones are often prepaid cellular telephones which are frequently not registered or subscribed to in the purchaser's or primary user's name.

4.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following: (1) cellular telephone #1, a silver LG cell phone, bearing model number LGMS210, serial number 707CYCV132851, and IMEI 359998-08-132851-2; (2) cellular telephone #2, a black Samsung, bearing model number SM-B311V, FCC ID: A3LSMB311V, HEX MEID: A00000477CA231 and serial number BD1J511SS/4-B; and (3) cellular telephone #3, a pink LG cell phone, bearing model number LGMS428, IMEI: 358479-07-378228-0, and serial number 606CYJZ378228, which are all associated with ANTHONY GAMBLE, hereinafter "Target Telephones." The Target Telephones are currently in the possession of the ATF and are stored in the ATF Washington Field Division Group III evidence vault in Washington, DC.

5.     Based on the information provided in this affidavit, I respectfully submit that probable cause exists that evidence, fruits, and instrumentalities of violations of federal narcotics and firearms laws, including 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. §§ 922(g)(1) and 924(c)(1), specifically those items set forth in Attachment B, are contained within the Target Telephones identified in Attachment A.

## BACKGROUND

6.      All information contained in this affidavit is either personally known to me or has been related to me by other law enforcement officers and/or other witnesses, or has been obtained from records and documents gathered during the course of this investigation. This affidavit contains information necessary to support probable cause for the search of the Target Telephones. The information contained in this affidavit is for the limited purpose of supporting the search and is not intended to include each and every fact and matter observed by or known to the affiant.

7.      Your affiant knows that cellular telephones are tools of the drug trade. Drug traffickers communicate with customers, suppliers, and co-conspirators via cellular telephones. Drug traffickers use cellular telephones to arrange meetings, request drugs, take drug orders, and arrange for co-conspirators to obtain and distribute drugs. To avoid detection by law enforcement, drug traffickers commonly use more than one cellular telephone and often send text messages, rather than engage in oral communications.

8.      Your affiant knows that cellular telephones used by drug traffickers contain valuable information and evidence relating to their drug trafficking. Such information consists of, but is not limited to, call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, browser history, and any other stored electronic data. This information can (i) reflect the preparation for, arrangement of, and commission of the trafficking of drugs; (ii) identify locations where drug traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cellular telephones by the drug traffickers; (iv) document meetings and communications between drug traffickers, their

4

customers, associates, and co-conspirators; (v) reflect communications between drug traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between drug traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, cutting, manufacturing, transferring, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

9.     Your affiant knows that individuals involved in drug trafficking often use cellphone cameras to take pictures of themselves as well as other members of their organization, often engaging in illegal activities such as the distribution of narcotics and the possession of firearms, as well as to take pictures of assets acquired with the proceeds of drug trafficking.

10.     Your affiant knows that individuals involved in drug trafficking often use cellphone video recording devices to take video recordings of other members of their organization often engaging in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11.     Based on your affiant's training and experience, your affiant uses the following technical terms to convey the following meanings:

a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability

6

to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d.      GPS: A Global Positioning System ("GPS") navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        f.      Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12.     Based on your affiant's training, experience, and research, your affiant has reason to believe that the Target Telephones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and internet search device.  In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

13.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

14.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the Target Telephones were used and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Telephones because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled

8

the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the Target Telephones consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Telephones to human inspection in order to determine whether they contain evidence described by the warrant.

16.    Manner of execution.  Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### Items to be Searched

17. This affidavit is being submitted in support of an application which seeks authorization to search the following Target Telephones:

       A.     Cellular Telephone #1: a LG cell phone Model number LGMS210, bearing IMEI: 359998-08-132851-2;

       B.     Cellular Telephone #2: a Samsung cell phone Model number SM-B311V, bearing FCC ID: A3LSMB311V and HEX MEID: A00000477CA231; and

       C.     Cellular Telephone #3: a LG cell phone Model number LGMS428, bearing IMEI: 358479-07-378228-0.

### PROBABLE CAUSE AND CASE BACKGROUND

18.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

19.    In June of 2014, ATF Washington Field Division Group III commenced an investigation into a violent drug trafficking organization, the MARSHALL Drug Trafficking Organization (MARSHALL DTO) led by JAHI MARSHALL. The MARSHALL DTO is a poly-drug trafficking organization responsible for the procurement, transportation, distribution and sale of large amounts of cocaine, cocaine base (crack), heroin, and phencyclidine (PCP), in the District of Columbia, Virginia and Maryland. This organization operates within the

residential streets and the local public housing projects in the Washington, DC, metropolitan area. This area includes 16th Street, SE, W Street, SE, V Street, SE, Galen Street, SE, Green Street, SE and Good Hope Road, SE.

20.     In December of 2015, ATF Special Agents and Task Force Officers conducted controlled purchases of illegal narcotics from MARSHALL, and other members of the MARSHALL DTO with the assistance of paid ATF Confidential Source #1 (CS-1) and ATF Confidential Source #2 (CS-2, and collectively the CSs), who purchased heroin and PCP. The information supplied by the CSs has been corroborated to the extent possible by independent investigation, which has included, but is not limited to, pen registers, physical surveillance, video surveillance, and other independent sources. The CSs used in this investigation have never been known to give false information while cooperating with law enforcement and their information has been deemed reliable. CS-1 has a criminal history that includes felony narcotics and forgery convictions. CS-2 has a criminal history that includes a felony narcotics conviction. During the course of the CSs' assistance with law enforcement, the CSs have proven to be credible and reliable. The CSs have been paid by law enforcement for the assistance they have provided.

21.     Utilizing the CSs, ATF has, on at least 30 occasions starting December 2015 until at least April 2017, purchased or attempted to purchase illegal narcotics from MARSHALL and other coconspirators.

22.     On March 27, 2017, the Honorable Rudolph Contreras of the United States District Court for the District of Columbia, in Misc. No. 17-mc-665, authorized the interception

of wire and electronic communications on (202) 294-0213, the cellular telephone used by MARSHALL (TT-1). Interceptions began on March 28, 2017, and ceased on April 26, 2017.

23.     On May 8, 2017, the Honorable Rudolph Contreras of the United States District Court for the District of Columbia, in Misc. No. 17-mc-665, again authorized the interception of wire and electronic communications from MARSHALL on TT-1. Interceptions began on May 8, 2017, and ceased on June 6, 2016.

24.     ANTHONY GAMBLE is a co-conspirator of MARSHALL's and a member of the MARHSALL DTO who was intercepted on TT-1. GAMBLE is a black male born on December XX, 1972, approximately 5'5", 140 pounds with Social Security Number xxx-xx-xxxx and FBI Number 758971MA6. He has the following criminal conviction: [1]

| Date | Offense | Disposition |
|------|---------|-------------|
| 09/23/1998 Washington, D.C. | PWID Cocaine | 1-3 years Probation 2 years |

25.     During the Title-III investigation, MARSHALL had two hundred and two (202) activations, via voice call and text message, with telephone number (202) 749-1312 subscribed to Anthony GAMBLE. In addition, during the investigation, GAMBLE has been frequently observed standing in the same area of 16th and W Streets, SE, with MARSHALL and other coconspirators where many of the drug transactions occurred.

26.     Some of the pertinent wire interceptions between MARSHALL and GAMBLE that were intercepted to and from TT-1 are summarized below. Because this affidavit is submitted for the limited purpose of establishing probable cause to secure search warrants for GAMBLE's

---

[1]     In compliance with Rule 49.1 of the Federal Rules of Criminal Procedure, only excerpts of certain personal identification information are included herein for privacy reasons. Such identifying information in full is available for the Court's inspection upon request.

cellular telephones, not every pertinent conversation is described or included in this affidavit. These interceptions are accompanied by characterizations that are based upon my experience and training, and the experience and training of other agents and officers, in this and other investigations.

27.     On April 18, 2017, at approximately 10:35 a.m., in activation #1363, GAMBLE placed a call to MARSHALL on TT-1 and informed MARSHALL that an unknown male wished to conduct what Agents believed to be a narcotics transaction. GAMBLE put the unknown male on the phone with MARSHALL. The unknown male then told MARSHALL that he was going to give GAMBLE "30 cents" and would give "the rest" to MARSHALL the following day. MARSHALL informed the unknown male that he was currently at the barbershop and informed the male that GAMBLE would "take care of him."  Based on your affiant's training and experience, your affiant believes that MARSHALL directed GAMBLE to facilitate a narcotics transaction on his behalf.

28.     On May 21, 2017, at approximately 4:50 p.m., in activation # 2545, MARSHALL placed a call to GAMBLE and stated, "that guy came back and he got the eight (8) joints." MARSHALL then told GAMBLE that MARSHALL was going to split it with GAMBLE and GAMBLE agreed on the split.  Your affiant believes that in this call, MARSHALL and GAMBLE are discussing a purchase of narcotics.

29.     On May 23, 2017, members of the ATF conducted surveillance in the area of 16th and W Streets, SE, Washington, D.C., and observed GAMBLE give MASHALL a cigarette from a pack of Newport cigarettes.  MARSHALL proceeded to place the cigarette between his lips and pull out a white object from the cigarette, believed to be the cigarette filter.

13

30.     MARSHALL then walked behind a bush located in front of 1522 W Street, SE, out of view of the camera.  At that time, MARSHALL was holding two cigarettes in his lips.  A short time later, two unknown individuals walked to the area near the bush.  One of the unknown individuals raised his hand behind the bush as if reaching for something.  MARSHALL emerged from behind the bush no longer holding the two cigarettes.  The two unknown individuals were then observed with a cigarette in each of their mouths leaving the area of 16th and W Streets, SE. Based on your affiant's training and experience, your affiant believes that MARSHALL and GAMBLE were creating and distributing "dippers" (cigarettes dipped in PCP) and that the two unknown individuals then purchased dippers GAMBLE and MARSHALL had prepared.

31.     On May 24, 2017, at approximately 8:27 p.m., in activation # 2797, MARSHALL received an incoming call on TT-1 from an unknown male at 202-749-5649. MARSHALL informed the unknown male that he left the area of 16th and W Streets, SE because "police had jumped out" on him, stating, "I almost got caught slipping and shit." MARSHALL informed the unknown male that Anthony GAMBLE, also known as "Tight," was "trying to make a move and get some of those Jimmy Jams." MARSHALL further stated that "he ("Tight") might already got 'em by now," and told the UM to give him ("Tight") a call. Based on your affiant's training and experience, your affiant believes that the unknown male called MARSHALL to purchase narcotics, and MARSHALL told the unknown male to call GAMBLE instead to purchase the narcotics.

32.     On November 21, 2017, Hon. G. Michael Harvey, U.S. Magistrate Judge signed a Search and Seizure Warrant for GAMBLE's residence located at 2809 Erie Street Southeast, Apartment A99, Washington, DC 20020, to search in relation to narcotics trafficking and firearm

14

violations.[2]  On or about November 28, 2017, at approximately 6:00 a.m., ATF and FBI special agents executed the warrant.  During the search of the residence, GAMBLE was present and three phones were recovered from a nightstand in a bedroom.  On the nightstand were pictures of GAMBLE and his wife, and underneath the bed on the same side of the nightstand was approximately 12 grams of cocaine base and small baggies on a plate, which GAMBLE admitted belonged to him.  Specifically, the following phones were recovered: (1) cellular telephone #1, a silver LG cell phone, bearing model number LGMS210, serial number 707CYCV132851, and IMEI 359998-08-132851-2; (2) cellular telephone #2, a black Samsung, bearing model number SM-B311V, FCC ID: A3LSMB311V, HEX MEID: A00000477CA231 and serial number BD1J511SS/4-B; and (3) cellular telephone #3, a pink LG cell phone, bearing model number LGMS428, IMEI: 358479-07-378228-0, and serial number 606CYJZ378228.  These phones were seized by the Bureau of Alcohol, Tobacco, Firearms and Explosives and placed in evidence.

33.     The Target Telephones are currently in storage at the ATF Washington Field Division Group III evidence vault in Washington, DC.  Based on my training and experience and knowledge obtained from other law enforcement officers, I know that the Target Telephones have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Telephones first came into the possession of the ATF.

---

[2]     The Affidavit in Support of Application for Search and Seizure Warrants (17-mj-892 (GMH)) submitted by your affiant on November 21, 2017, attached hereto as Exhibit 1, is incorporated herein by reference. As detailed in the affidavit at paragraphs 58-61, GAMBLE was linked to his address based on, among other things, Gamble providing the address during a prior law enforcement contact and law enforcement surveillance.

## <u>CONCLUSION</u>

34.     Based on your affiant's training and experience, your affiant believes a search of the Target Telephones may reveal evidence pertaining to GAMBLE's violations of federal narcotics laws, including 21 U.S.C. §§ 841(a)(1) and 846, and federal firearm laws, including 18 U.S.C. §§ 922(g)(1) and 924(c)(1). Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Telephones as described in Attachment A to seek the items described in Attachment B.


_____
Kevin Smith
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Signed and sworn to before me this _____ day of January, 2018.


_____
The Honorable Deborah A. Robinson
United States Magistrate Judge
    for the District of Columbia